UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD BARLOW, et al.,

        Plaintiffs,                       Case No. 10-cv-14371

v.                                  HONORABLE STEPHEN J. MURPHY, III

LOGOS LOGISTICS, INC. and APPTREE,
INC.,

        Defendants.

_____/

## OPINION AND ORDER OF DISMISSAL

At issue is whether the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, requires a staff leasing agency to pay overtime wages to drivers whom it has leased to a motor carrier and whose work directly affects the safety of vehicles in interstate commerce. The Court finds that it does not.

### BACKGROUND

Logos Logistics, Inc. ("Logos") is a motor carrier certified by the Department of Transportation ("DOT") that moves automobile parts from suppliers in Michigan, Ohio, Canada, and Mexico to manufacturing plants located throughout the United States. Along one of these routes, springs and shocks travel from outside Michigan to a supply facility in Detroit before being transported across the city to a Chrysler manufacturing plant.

In April 2010, Logos hired the plaintiffs ("the Drivers") to drive the springs and shocks from the supply facility to the Chrysler plant. They worked on the route until October, 2010. Then, Logos fired them. But the Drivers soon found new work at Apptree, Inc. ("Apptree") — a staff leasing agency founded to supply drivers to Logos — and under a leasing agreement, they returned to driving the same route as before. Apptree had no other clients

at the time.

As they had when they worked for Logos directly, the Drivers received their daily work assignments from Logos dispatchers, were supervised by Logos management, followed Logos instructions on how to interact with its customers, used Logos trucks and trailers, and reported equipment problems to the Logos operations manager. Apptree, however, assumed other responsibilities. Its office manager and, later, an office assistant coordinated the Drivers' schedules and requests for time off, managed the payroll, and maintained driver records. Apptree also set the pay rates for its drivers, promulgated binding employment policies in a comprehensive employee handbook, administered all disciplinary actions, and formally made all promotion, demotion, and termination decisions. Unbeknownst to the Drivers, Logos determined which of them would receive quarterly safety bonuses and influenced Apptree's promotion, demotion, and termination decisions.

During their tenure at both Logos and Apptree, the Drivers earned their regular hourly rate of pay even if they worked in excess of forty hours a week. The Drivers accordingly filed this lawsuit under the FLSA for overtime wages against Logos and Apptree.[1]

Both companies denied liability. In pretrial motions, the companies principally argued that an FLSA exemption for employees covered by the Motor Carrier Act ("MCA"), 49 U.S.C. § 31502, relieved them of liability. The Court agreed in part. It granted summary judgment to Logos on that theory after finding that Logos was a motor carrier subject to the Secretary of Transportation's jurisdiction and that the Drivers' activities directly affected the safety of vehicles in interstate commerce. But the Court denied summary judgment to

---

[1] A few months later, the Drivers added FLSA retaliation claims against both companies. The retaliation claims were dismissed before trial.

Apptree. Because Apptree was not a motor carrier, the Court concluded that it could benefit from the exemption only if all considerations bearing on the economic reality of the situation showed that the agency jointly had jointly employed the Drivers with Logos. Factual disputes, however, prevented the Court from resolving the joint employment question on summary judgment.

The case went to trial on the joint employment issue. Although Apptree moved for a directed verdict after the close of evidence, the Court permitted the case to go to the jury. And the Court instructed the jury to consider nineteen factual questions on a special verdict form relevant to the legal issue of whether a joint employment relationship existed. The jury returned a mixed verdict.

After trial, the Court questioned the assumption that Apptree's liability depends on a finding of joint employment considering the economic reality of the Drivers' employment relationships. The Court therefore requested supplemental briefing from the parties and an amicus brief from the DOT.

## DISCUSSION

The FLSA requires employers to pay employees engaged in commerce at one and one-half their regular rate of pay for all time worked in excess of forty hours per week. *See* 29 U.S.C. § 207(a)(1). But exempt from the FLSA's overtime wage provisions is "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service" under 49 U.S.C. § 31502. 29 U.S.C. § 213(b)(1). The Court holds that this exemption bars the Drivers' overtime claims against Apptree.

I.      Meaning of "Employees"

Section 31502 empowers the Secretary to prescribe the "qualifications and maximum hours of service of employees of . . . a motor carrier." [1] 49 U.S.C. § 31502(b)(1). As interpreted, this section gives the Secretary jurisdiction over workers (1) who are employed by a motor carrier engaged in interstate commerce and (2) whose activities directly affect the safety of vehicle operations. *See Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 904 (6th Cir. 2002); *Benson v. Universal Ambulance Serv., Inc.*, 675 F.2d 783, 785 (6th Cir. 1982). Because the Court has already determined that the Drivers meet the second requirement and that Logos is a motor carrier, the focus is now on whether the Drivers were also employees of Logos when they worked for Apptree.

A.      Competing Interpretive Approaches

A few courts have concluded that leased drivers are employees. For example, *Moore v. Universal Coordinators, Inc.*, 423 F.2d 96 (3d Cir. 1970), held that drivers leased to a private motor carrier were its employees and exempt from the FLSA's overtime wage requirements. Interpreting the portion of § 31502 concerning "employees . . . of a private motor carrier," the court observed that the Secretary had promulgated regulations concerning the qualifications and hours of employees that applied to leased drivers. *Id.* at 98. And the court concluded that the Secretary had not exceeded his power in doing so,

---

[1] This provision was originally enacted as § 204 of the MCA. At the time, the MCA conferred the power to regulate employees of a motor carrier on the Interstate Commerce Commission. *See* Motor Carrier Act of 1935, Pub. L. No. 74-225, 49 Stat. 543. Congress transferred this power to the DOT in 1966, *see* Act of Oct. 16, 1966, Pub. L. No. 89-670, 80 Stat. 939, and then to the Federal Motor Carrier Safety Administration, an agency within the DOT, in 1999, *see* Motor Carrier Safety Improvement Act of 1999, Pub. L. No. 106-159, 113 Stat. 1748.

4

because the primary purpose of the MCA was to grant the "Secretary power to regulate carriers' employees in the interest of safety of operation." *Id.* at 98–100.

Other courts have reached similar results. *See, e.g.*, *Songer v. Dillon*, 618 F.3d 467 (5th Cir. 2010); *Tidd v. Adecco USA, Inc.*, No. 07-11214, 2010 WL 996769 (D. Mass. Mar. 16, 2010). But whereas *Moore* relied heavily on the Secretary's understanding of the MCA without reference to the companies' relative responsibilities for managing or paying the leased drivers, other decisions pursued a more fact-bound analysis.

*Songer v. Dillon*, 618 F.3d 467 (5th Cir. 2010), is representative. While recognizing the MCA's aim of promoting safety, the *Songer* court ultimately concluded that the drivers were subject to the Secretary's jurisdiction because a commercial hauler and staff leasing agency jointly employed them. *Id.* at 472–73. The court's reliance on joint employment is significant. Far from using joint employment casually to describe the situation of drivers receiving a paycheck from one company and receiving directions from another, the court understood the phrase to signify a legal concept taken from employment law. Hence, to determine if the hauler and agency were joint employers, the court turned to an unpublished district court case that evaluated a similar situation using the FLSA's economic reality test, *see id.* at 473 (citing *Tidd v. Adecco USA, Inc.*, No. 07-11214, 2010 WL 996769 (D. Mass. Mar. 16, 2010)) — a multi-factor test that requires examining the "circumstances of the whole business activity" to see if an employment relationship exists, *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984). The court then proceeded to analyze the hauler's and the agency's relative responsibilities for hiring, training, payroll, control, and operations — all considerations relevant to the economic reality test. *See Songer*, 618 F.3d

5

at 473. And having found a joint employment relationship existed, the court held that the exemption applied. *See Songer*, 618 F.3d at 473.

Though the *Songer* court said little about why it considered either joint employment or the economic reality test important, by using both, the court suggested that the economic reality of a situation determines if the Secretary of Transportation has jurisdiction over a leased employee. The resulting decision thereby subjected the Secretary's jurisdiction over drivers to the particular managerial and contractual arrangements adopted by each motor carrier.

B.   Relevance of the Economic Reality Test

Initially, the parties here modeled their analysis after the same unpublished decision on which *Songer* relied. *See, e.g.*, Pl.'s Resp. re Sec. Mot. Summ. J. 11–12, ECF No. 28 (citing *Tidd*, 2010 WL 996769). They accordingly argued at summary judgment and at trial that the motor carrier exemption applies only if — considering the economic reality of the relationship — Apptree jointly employed the Drivers with Logos. Although the Drivers urge the Court to continue using this framework, *see* Pl.'s Second Post-Trial Br. 5–8, ECF No. 72, the Court finds it sets forth the the wrong approach.

The basic error in the approach is that it requires interpreting the MCA through the FLSA. Both the concept of joint employment and the economic reality test come from cases and regulations interpreting the FLSA. *See, e.g.*, 29 C.F.R. § 791.2 (joint employment); *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961) (economic reality test). But language in the FLSA does not govern the motor carrier exemption's question; the meaning of "employees" in the MCA does. *See Levinson v. Spector Motor Service*, 330 U.S. 649, 676–77 & n.19 (1947). The FLSA language setting forth the motor carrier

6

exemption is only an acknowledgment that the Department of Labor's jurisdiction yields to that of the DOT. *See id.* at 661, 676–77; *cf. Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 48–49 (1943) ("[Section 31502] free[s] operators of motor vehicles from the regulations of two agencies . . . ."). Asking whether the economic reality test shows a motor carrier jointly employed a driver with a leasing agency makes little sense — unless one assumes that both statutes share a common definition of "employees."

Whether the Drivers think the two statutes have the same meaning in all cases or just in cases involving the motor carrier exemption is unclear, but plainly the text cannot be a chameleon with the same words bearing different meanings in different contexts. *See Clark v. Martinez*, 543 U.S. 371, 382–83, 386 (2005) (describing as "dangerous" the "principle that judges can give the same statutory text different meanings in different cases"). Whatever meaning "employees" in § 31502 has for determining who is subject to the motor carrier exemption it must also have for assessing the Secretary's authority to prescribe qualifications for loaders and mechanics. The "lowest common denominator, as it were, must govern" all of the law's applications. *Clark*, 543 U.S. at 380 (2005). And if this is true — as it must be — the Drivers' argument here implies that the Secretary should consult FLSA cases involving the economic reality test and, by extension, Department of Labor regulations concerning joint employment to determine what authority § 31502 — a section within the MCA — grants. That cannot be correct.

There are also other reasons to reject the argument. For one, existing interpretations of the FLSA and MCA are irreconcilable. The FLSA defines the employment relationship in "exceedingly broad" terms. *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011). Accounting for these capacious definitions and the statute's remedial

7

purpose, the economic reality test thus sweeps broadly, catching up even non-traditional employment relationships. *See Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528–30 (1950); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729–30 (1947). In contrast, sensitive to Congress's overriding concern with safety in interstate transportation, the MCA uses "employees" narrowly — or at least differently — enough to exclude workers whose jobs do not directly affect interstate commerce. *See United States v. Am. Trucking Ass'ns*, 310 U.S. 534 (1940). Whatever else this interpretation signals about the word's meaning, it certainly forecloses the assumption that the FLSA and MCA ascribe to "employees" the same meaning since the economic reality test makes no allowances for the significant definitional limitation. The effect of an employee's work on interstate commerce simply does not figure into the economic reality test. This test instead focuses on economic dependence. *Solis*, 642 F.3d at 523.

For another reason, no one — not the Drivers or any other court — has explained why grafting the economic reality test onto the MCA makes legal sense. And last, the various agencies tasked with administering the MCA over the years have not relied on the economic reality test to determine the extent of their own authority. *See* Gov't Br. 8, ECF No. 73. Disregarding the Secretary's considered and consistent position in the absence of any countervailing considerations — regardless of whether it should receive *Chevron* deference — would be highly presumptuous. *See Bragdon v. Abbott*, 524 U.S. 624, 642 (1998) ("[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)); *In re Carter*, 553 F.3d 979, 987 (6th Cir. 2009) (consulting the views of an agency expressed in

an amicus brief). Reliance on the economic reality test and cases using it to interpret other FLSA provisions is thus misplaced.

      C.    <u>Agency Interpretations of "Employees"</u>

This final consideration also suggests a better starting point for understanding § 31502: the regulations the Secretary has promulgated under it. If the statutory text does not compel a particular conclusion, courts should defer to an agency's reasonable interpretations of a statute that it administers. *See City of Arlington v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

      1.    <u>Regulations Including Leased Drivers as "Employees"</u>

As regulations concerning hours of service and minimum qualifications show, the Secretary understands "employees" to include leased drivers. For example, regulations enacted under § 31502 limiting hours of service apply to "all motor carriers and drivers." 49 C.F.R. § 395.1. Similarly, the regulations prescribing driver qualifications apply to "persons who drive commercial vehicles as, for, or on behalf of motor carriers." 49 C.F.R. § 3941.1(a). The regulations have similar breadth to those the court in *Moore* confronted. *See Moore*, 423 F.2d at 98 (examining a regulation providing that "no person shall drive . . . any motor vehicle" without particular qualifications). What is notable about both is that they make no reference to the contractual arrangement under which a driver labors. Rather, the regulations broadly apply to all persons — leased or not — driving vehicles on behalf of a motor carrier.[3]

---

[3] The phrasing in these regulations is consistent with how the FMCSA uses the word "employee" in regulations that do not directly concern drivers' hours and qualifications. For example, the Federal Motor Carrier Safety Regulations, which generally govern motor carrier safety, define "employee" as "any individual, other than an employer, who is

The Drivers, however, reply that the regulations are not as clear about who is an employee as they seem. Because § 31502 permits the Secretary both to regulate the hours and qualifications of employees and to provide for the safe operation of motor carriers, and because the regulations do not specify which of these authorizations they are invoking, the Drivers suggest that the regulations apply to leased drivers not because they are employees but rather because broad coverage is necessary to provide for the safe operation of the motor carrier. Pl.'s Second Post-Trial Br. 8–9. And if so, the Drivers argue, the regulations provide no guidance about the meaning of "employees."

Although correct in their premises, the Drivers' incorrectly presume that regulations concerning the hours and qualifications of drivers do not rest on the statutory provision specifically providing authority to regulate hours and qualifications. Agencies do not usually pass over an obvious candidate supporting a regulation in favor of a less visible one lest they imply Congress hid an elephant in a mousehole. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Second, the Drivers' argument incorrectly suggests that the power to regulate employees of a motor carrier is mere surplusage. A power to provide for the safe operation of motor carriers that is broad enough to reach leased drivers on theory that their work affects safety necessarily reaches any other employee whose work affects transportation safety. And a third problem with the Drivers' argument is that it is unhelpful to their overall case. Even if the Court were to agree with the Drivers about which statutory provision supports the regulations applying to them, it would not change the reality that

_____

employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety." 49 C.F.R. § 390.5. While that circular definition is not elucidating by itself, the FMCSA further explains that included in the term is any "driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle)." *Id.* A definition expansive enough to encompass drivers generally, even if they are independent contractors, surely includes leased drivers.

10

leased drivers are subject to the Secretary's jurisdiction under some provision in § 31502. The motor carrier exemption would apply to the Drivers anyway. The specific grant under which the Secretary exercises jurisdiction matters for coherence rather than result.

2.    Permissibility of the Interpretation

While § 31502 may not compel the Secretary's conclusion that "employees" means drivers of all kinds, the interpretation is reasonable. To evaluate it, the Court begins, as it must, with the text. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *Am. Trucking*, 310 U.S. at 543. Section 31502 says without elaboration that the Secretary of Transportation has jurisdiction over "employees of . . . a motor carrier." 49 U.S.C. § 31502(b)(1). In the absence of a statutory definition, two interpretations of "employees" are possible. One is that "employees" includes leased drivers. As the commonplace phrases "leased employee" and "employee leasing" suggest, leased workers may be a particular subset of employees and thus included in the general term. But it is also possible to understand "employees" in the more restrictive sense of direct hires. *Cf. Oxford English Dictionary* (3d ed. 2014) (noting that "employee" most specifically means "a person employed for wages or a salary *under an employment contract*") (emphasis added).

Though this second interpretation seems less likely if "employees" is to be given its full range of meaning, choosing between these options requires examining the word in "its surroundings." *Am. Trucking*, 310 U.S. at 565; *see also Utility Air Regulatory Grp. v. E.P.A.*, slip. op. at 16–17 (U.S. June 23, 2014) (observing words must be read in their context). Looking just beyond the phrase "employees of . . . a motor carrier," one finds that § 35102 grants the Secretary power to prescribe "qualifications and maximum hours of service of employees of . . . a motor carrier." 49 U.S.C. § 31502(b)(1). The court's analysis, as well

11

as congressional discussions of the MCA, reflect the law's primary design: to promote safety of transportation in interstate commerce. *See Levinson*, 330 U.S. at 661–62; *Am. Trucking*, 310 U.S. at 544–53. And interpreting "employees" to encompass all drivers, including leased drivers, is consistent with that aim. *Cf. Southland Gasoline*, 319 U.S. at 48 (describing the motor carrier exemption as "exempting the drivers of motors" from the FLSA). A definition that excludes leased drivers might permit motor carriers to evade DOT safety regulations prescribing minimum qualifications and limiting drivers' hours through clever contracting. That result would be contrary to the law's overriding concern with safety. *See Moore*, 423 F.2d at 99–100.

How other transportation safety statutes define "employees" bolsters the conclusion. Several define "employee" to mean "an operator of a commercial motor vehicle (including an independent contractor when operating a commercial motor vehicle), a mechanic, a freight handler, or an individual not an employer," whose work "directly affects commercial motor vehicle safety" and who is not a governmental employee. 49 U.S.C. § 31132(2) (statute providing for commercial motor vehicle safety regulations); *see also* 49 U.S.C. § 31101(2) (statute providing for grants to study commercial motor vehicle safety regulations); 49 U.S.C. § 31301(7) (statute providing for commercial motor vehicle operator regulations). The definitions, though not controlling the interpretation of § 31502, suggest that understanding "employees" to include all drivers whose work directly affects the safety of vehicles in instate commerce is reasonable. Legislative bodies often use words consistently in the same context. *See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972).

To all of this analysis, the Drivers offer a single response: they argue that Congress's failure to specify that "employees" includes leased drivers means that the term cannot include them, especially considering that FLSA exemptions are construed narrowly. Pl.'s Second Post-Trial Br. 9. Although Congress could have specified that "employees" includes or does not include leased drivers, there is nothing wrong with its decision to use a general, undefined term instead. *See City of Arlington*, 133 S. Ct. at 1868 ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."); *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 740-41 (1996) ("[Courts presume] that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows."). Congress frequently does so, leaving it to executive bodies to resolve ambiguities and fill gaps. *See, e.g.*, *City of Arlington*, 133 S. Ct. 1863; *Smiley*, 517 U.S. 735; *United States v. Morton*, 467 U.S. 822 (1984); *Chevron*, 467 U.S. 837. And all the evidence here — the statutory text, purpose, and context — points to Congress delegating power to the Secretary to define "employees."

Furthermore, in interpreting § 31502, the Secretary was under no obligation to apply the principle that exemptions to the FLSA are construed narrowly. If the Secretary's jurisdiction depended on language found in the FLSA itself, the canon of construing remedial statutes narrowly would apply. *See A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). But the Drivers overlook the important point that the Secretary's jurisdiction depends exclusively on the MCA. *See Levinson*, 330 U.S. at 676–77 & n.19. Their argument goes awry for many of the same reasons that their attempt to make the

13

Secretary's jurisdiction depend on the economic reality test fails. It subordinates the MCA to the FLSA in contravention of the statutory text; it ignores that the MCA is not a remedial statute subject to the canon of narrow construction; and it lacks foundation in past judicial or agency practice.

Therefore, the Court concludes that the Secretary's understanding that "employees" includes leased drivers is both permissible and entitled to deference.

II.   Effect of Counting Leased Drivers as Employees

Because leased drivers are employees subject to the Secretary's jurisdiction, only the question of whether Apptree benefits from the exemption remains. The FLSA supplies an answer: exempt from the FLSA's overtime wage provisions is "any *employee* with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." 29 U.S.C. § 213(b)(1) (emphasis added). By its terms, the motor carrier exemption follows the employee. There is no requirement that the company cutting a worker's paycheck meet any criteria. Apptree's status as a non-motor carrier is thus irrelevant to whether it has an obligation to pay overtime wages to workers independently subject to the Secretary's jurisdiction.

Therefore, the Court concludes that the FLSA's overtime wage requirements did not apply to the Drivers during their tenure at Apptree. The Drivers' remaining claims will be dismissed.

14

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that the overtime wage claims against

Apptree are **DISMISSED** and that the complaint is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: July 20, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on July 20, 2014, by electronic and/or ordinary mail.

s/Carol Cohron
Case Manager

15